THE PEOPLE OF THE STATE OF NEW YORK, Respondent, v HARRISON HUMPHREY, Appellant.

Second Department, July 23, 1979

**APPEARANCES OF COUNSEL**

*Goldberger, Feldman & Dubin (Michael Young* of counsel), for appellant.

*Carl A. Vergari, District Attorney (Cheryl Kosan* and *Gerald D. Reilly* of counsel), for respondent.

OPINION OF THE COURT

MOLLEN, P. J.

The defendant stands convicted, upon a jury verdict, of two counts of criminal possession of a weapon in the third degree. On this appeal he contends, *inter alia,* that his motion to suppress certain physical evidence seized from him should have been granted. For the reasons which follow, the judgment should be reversed, the motion to suppress granted and the indictment dismissed.

During the early morning hours of January 12, 1976, police officers assigned to the Crime Prevention Unit of the New Rochelle Police Department were engaged in the patrol and surveillance of the Main Street area in New Rochelle. One of the officers was positioned on the second floor of a building overlooking Main Street. From that vantage point he could view a portion of Main Street, and nearby streets and intersections. Although alone at that location, the officer was in radio contact with several other members of the unit in the area.

At 2:50 A.M. the officer saw a yellow Lincoln proceed east on Main Street and stop at the intersection of Main Street and Center Avenue. A white male exited the passenger side of the vehicle, walked west on Main Street and entered the Lollipop Bar. The car then made a right turn onto Center Avenue and was out of sight for one minute. It was then seen coming toward Main Street on Maple Avenue, apparently having circled the block.

Before reaching Main Street, the car pulled over to the curb and a Black male, identified as the defendant, exited the car and entered an alley running parallel to Main Street. The alley did not extend to the rear of the Lollipop Bar. The defendant was out of sight for 30 seconds. As the defendant exited the alley, the white male who had previously left the car emerged from the bar and both men got back into the vehicle. The car then made a right turn onto Main Street and came to a stop in front of, and directly below, the spot where the officer was positioned. It waited there for several minutes, during which time the officer observed that it contained three occupants.

The car again went to the corner of Main Street and Center Avenue, where it waited 10 minutes before making a left turn onto Center Avenue. After another minute the car was again

seen proceeding east on Main Street. The car came to a stop near the Lollipop Bar and a second white male exited and went into the bar, returning a minute later.

Another officer, who was in plainclothes and also assigned to the Crime Prevention Unit, then went into the bar, and asked its owner to go outside and look at the people who were in the car. The owner did so and told the officer that he thought he recognized two of the occupants as people with whom he had had a problem the summer before. He did not specify what the problem was. The plainclothes officer then returned to his vehicle, which was parked on Maple Avenue.

The defendant's car remained parked near the Lollipop Bar for approximately 40 minutes. At 3:55 A.M. the defendant and another of the car's occupants left the vehicle and walked toward the bar. They each appeared to be putting something into the waistbands of their pants or under their coats, but the officer did not see what it was. They approached the door of the bar and tried to open it. When the door did not open they returned to the car and drove away, going east on Main Street.

The officer who had had the car under surveillance then notified the other members of the Crime Prevention Unit that the car had pulled away. The officer's testimony, equivocal and inconsistent as between his cross-examination and his redirect examination, was to the effect that he had seen the men take "something out of their pocket, put it underneath their coat. It might be a gun." The car was stopped by the other police officers after it had traveled approximately three blocks. It was not speeding and no traffic infraction had been committed. The first officer who approached the car did so with his gun drawn. Another officer who approached the car saw one of its front-seat passengers "hunching over". Upon directing that passenger to exit the car, the officer saw what appeared to be a gun protruding from under the front seat. The defendant, who was driving, was also told to exit the car. One of the officers entered the car saw a lump under the floor mat and, upon lifting it, discovered a second firearm. Altogether, several police cars, both marked and unmarked, responded to the location where the defendant's vehicle was stopped.

The court, in denying the motion to suppress, relied on CPL 140.50 and on the fact that the defendant had conducted

himself in a furtive and evasive manner and was possibly armed with a deadly weapon.

CPL 140.50 (subd 1), as it applies to this case, provides: "[A] police officer may stop a person in a public place * * * when he reasonably suspects that such person is committing, has committed or is about to commit [a crime]".

Under the statute the minimum requirement before a stop can be made is the existence of a "reasonable suspicion" of criminal activity. In *People v Sobotker* (43 NY2d 559, 563), which also involved a police stop of an automobile on a public street, the court stated that "except for routine checks to enforce automobile regulations * * * our repeated decisions make abundantly clear that, absent at least a *reasonable* suspicion that its occupants had been, are then, or are about to be, engaged in conduct in violation of law, the stopping of an automobile by the police constitutes an impermissible seizure" (see, also, *People v Ingle,* 36 NY2d 413). The court *(supra,* p 564) went on to define reasonable suspicion as " 'the quantum of knowledge sufficient to induce an ordinarily prudent and cautious man under the circumstances to believe that criminal activity is at hand' " (quoting *People v Cantor,* 36 NY2d 106, 112-113). Under the circumstances present there was sufficient basis for stopping the vehicle and making inquiry, but not for initial police conduct which was equivalent to a seizure of the occupants of the vehicle and their arrest solely on the basis of the prior observations.

The presence of the defendant's vehicle in the vicinity of the Lollipop Bar despite the early morning hour was, at the least, equivocal, particularly since the bar was still open for business. For the same reason, the entry of each of the defendant's companions into the bar is not suspect. Such "innocuous behavior alone will not generate a * * * reasonable suspicion that a crime is at hand" (see *People v De Bour,* 40 NY2d 210, 216). With respect to the defendant's entry into the alley, there was no evidence that it was done in an evasive or clandestine manner. That act is at best equivocal and susceptible of innocent interpretation. The statement from the bar's owner that he thought he recognized two of the car's occupants as people with whom he had had "a problem" the prior summer does not raise the level of suspicion. The identification was not at all clear, and any "problem" was not only unspecified, but was remote in time.

Although allegedly seeing the defendant and a companion

place something into the waistbands of their pants, the officer who made that observation testified that he did not see what the object was. Finally, after unsuccessfully trying the bar's door in the normal manner, the defendant returned to the vehicle and drove away. No further attempt to gain entrance was made and the car was driven away at a normal speed.

When all of these facts are considered together, we can only conclude that the stop of the defendant's vehicle and the seizure inherent in the police officers' actions were made without the requisite showing of probable cause (see *People v Cantor,* 36 NY2d 106, *supra; Dunaway v New York,* 442 US 200). These facts lead us to conclude that the hearing court's determination that the stop was proper for the reason that the defendant had acted furtively and evasively and was possibly armed, is simply not supported by the evidence adduced at the hearing. At most the police officers had an appropriate basis (reasonable suspicion) for a stop and inquiry; not for an approach with drawn guns and an order to vacate the vehicle, thus amounting to a seizure.

We also note that this conclusion is not inconsistent with the decision of this court in *People v Pollaci* (68 AD2d 71). Although the facts in *Pollaci* were somewhat similar to those here, we upheld the court's order denying a motion to suppress physical evidence. However, in *Pollaci,* prior to the stop of the automobile the police knew that the defendant was operating an improperly registered vehicle; thus their conduct was appropriate.

In view of this result, there is no need to address defendant's other contentions.

Suozzi, J. (concurring). I concur in the majority's holding that the stop of defendant's car by the police with guns drawn was constitutionally impermissible and that the defendant's motion to suppress should be granted. However, I disagree with the majority's reasoning in support of that conclusion.

Contrary to the majority's characterization of defendant's conduct as equivocal, I share the dissenter's conviction that the defendant's conduct in and around the Lollipop Bar & Discoteque from the time of his arrival there to his departure did provide "specific and articulable facts" (see *People v Cantor,* 36 NY2d 106, 111-113) for reasonably suspecting that defendant and his companions were about to commit a crime.

Under these circumstances the police would have been justified in forcibly stopping defendant and his companions at that juncture and frisking them, if necessary (see CPL 140.50, subds 1, 3; *People v De Bour,* 40 NY2d 210, 223; *People v Cantor, supra).*

This justification, however, continued only as long as there existed a factual basis for the reasonable suspicion that a crime was about to be committed.

As my colleague correctly points out in his dissent, the observed conduct of the defendant and his companions in and about the bar "did not constitute a crime or even an attempt at a crime. The record discloses no overt act which went beyond the state of mere preparation" and the "law does not punish evil thoughts" *(People v Bracey,* 41 NY2d 296, 300).

The sudden departure of the defendant and his companions from the scene and target of the suspected crime was an unequivocal signal that their plan and intention to commit a crime at that time and place had been abandoned. Therefore, unless a continuing basis for reasonable suspicion of a crime about to be committed may be found in the behavior of the defendant and his companions from the time of their departure and the stop, as in *People v Andino* (60 AD2d 633), the justification dissipated at the moment of departure, notwithstanding that the decision to stop may have been made by the police at a time when reasonable suspicion existed.

Since it cannot be disputed on this record that the target of the suspected crime was the bar, the suspected crime, if any, after the departure from the scene would have to be found in the subsequently observed conduct. The dissent takes great pains to characterize the subsequent driving pattern of the car between the moment of departure and the stop three blocks away as evasive, thereby enhancing the reasonable suspicion of the police which made the stop legally permissible (see *People v Andino, supra).* In my view, the dissent's characterization is without foundation in this record. It cannot be equated or analogized with the subsequent suspicions and evasive behavior in *Andino.* The police officers admitted that the car was being operated within the speed limit and no traffic violation had been or was being committed. There was no evidence of any other conduct giving rise to a reasonable suspicion that another crime was about to be committed or had been committed.

Judging this forcible stop with guns drawn in this context,

in the absence of objective criminal activity between the departure and the stop, it cannot pass constitutional muster (see *People v Sobotker,* 43 NY2d 559; cf. *People v Andino, supra).*

For these reasons, I join the majority in holding that the motion to suppress should be granted.

O'CONNOR, J. (dissenting). I respectfully dissent from my brethren of the majority in their conclusion to reverse the judgment of conviction and to dismiss the indictment. In my opinion, the denial by the trial court of appellant's motion to suppress was proper and should be upheld. It is to that facet of the appeal the following dissenting opinion is addressed.

### THE FACTS

The snow had stopped falling and the traffic was unusually light, even for that early hour of a Sunday morning, as the four members of a special crime unit manned their posts on a stakeout in a high-crime area of downtown New Rochelle.

The Lincoln Continental moved slowly past the Lollipop Bar & Discoteque at No. 596 Main Street and came to a stop less than a block away at the intersection of Main and Center. Across the street at No. 615 Main, in a bay window on the second floor over Tony's Fish Market, Officer De Marco watched the drama unfold below. From his vantage point, his vision embraced the broad expanse of Main Street for several blocks to the east and to the west it envisioned its intersection with Maple Avenue, taking in, of course, the Lollipop Bar & Discoteque. A white male (John Gaudio) exited the passenger side of the limousine, walked back to No. 596 and entered the bar. The Lincoln made a right turn out of vision on Center Avenue, reappearing a moment or two later, as it came north on Maple, stopping some 60 to 70 feet south of its intersection with Main. A Black male (appellant) exited the driver's side, crossed Main and entered an alleyway which ran toward, but did not connect with, the rear portion of the Lollipop Bar. Gaudio, who remained in the bar but for a minute, returned to the automobile and was soon joined by appellant, who had stayed in the alleyway for approximately 30 seconds. The car turned onto Main Street, stopping in front of No. 615, directly below De Marco's lookout. He could now see that there were three people in the automobile—Humphrey (the appellant

driver), Gaudio in the back seat, and one Gelardo in the front passenger seat.

After a short pause, the yellow Continental moved to the northwest corner of Main and Center where it remained with its motor running for about 10 minutes. It then turned onto Center, was immediately out of vision, but was shortly seen proceeding west on Main Street, this time on the same side of the street as the Lollipop and stopping just beyond the bar and between it and its adjacent building. There it remained with its motor running for some 40 minutes.

Gelardo entered the bar and after a minute or two returned to the automobile. In the interim, Officer Wilson, a member of the police unit, in response to a radio message from De Marco, entered the bar and asked the owner to go out to the street and to casually observe the Lincoln and its passengers. The owner (Lalli) shortly returned and in substance stated that he thought he recognized two of the car's occupants as people he had had "a problem" with the summer before.

It was now about 3:15 A.M. and the Lincoln and its passengers remained parked outside the Lollipop with the motor running until approximately 3:55 A.M.

At this point, Gelardo again left the vehicle, this time accompanied by appellant, and, as they walked toward the bar. De Marco testified: "[T]hey * * * appeared to put something under their coat or into their waistband." The two men tried the front door of the bar, did not get in, and "immediately" went back to the automobile and it "immediately" left that location.

As the suspect car pulled away from the Lollipop Bar, it was going east on Main Street. Officer Barrett, alone and in uniform, in a marked patrol car, was coming north on Center under radio orders to intercept the Lincoln.

Barrett's testimony is significant in that he consistently contended, through extended cross-examination, that as the cars approached the intersection of Main and Center, the Lincoln made conscious efforts to avoid the patrol car. He said that the Lincoln driver, "when he saw the patrol car, he picked up speed" and that the driver (appellant) signaled for a left turn into Center and, at the last moment, "veered left and then shot * * * down Main Street". As a result of this evasive maneuver, Barrett overshot the intersection and had to stop and back up in order to pursue the Lincoln down Main Street.

In response to a question, Barrett said that although the Lincoln was within the speed limit and did not violate any traffic law, it was "proceeding at a high rate of speed" and the following extract from the record is illuminating:

"Q. You just said he shot down?

"A. Proceeding at a high rate of speed * * * I didn't have enough time to clock him.

"Q. Was the car speeding?

"A. I couldn't determine.

"Q. You used the term 'shot down Main Street'?

"A. He accelerated when he saw the police car."

It was Barrett's opinion that appellant was going between 30 and 33 miles an hour and Officer Rossi testified that because of the existing snow conditions "he was going a little fast for the road."

Whether appellant was violating the legal speed limit is not clear, but the uncontroverted police testimony was that the car, under existing weather conditions, was going fast and both Rossi and Barrett described its efforts to evade the police. Earlier, Rossi said that the car did not try to get away from the police.

In any event, Barrett said he put on his red revolving lights a block before appellant brought the Lincoln to a stop at Main and Lawton Avenue. Barrett pulled up behind the Lincoln and, with gun drawn, asked appellant for his license and registration, which were then produced and at which time, Barrett sheathed his gun because, he said "[t]here was [sic] enough policemen."

Barrett then had appellant exit the car and stand by the car's hood. From the record, it appears that both Rossi and Wilson arrived almost simultaneously with Barrett. It was Rossi's testimony that as Gelardo exited from the front passenger side he, Rossi, saw the handle and the frame of a revolver "a little bit to the left of where he [Gelardo] was sitting in the car." The gun was a .32 caliber chrome-plated revolver.

At this point, Officer Wilson saw a bulge under the driver's floor mat and the ensuing search disclosed a .357 magnum revolver. Both guns were found to be loaded and fully operable and none of the occupants of the vehicle was licensed for either gun.

THE LAW

Reduced to simple terms, the issues presented on this facet of the appeal are: (1) was the initial encounter of the police lawful in its inception; and (2) when weighed against precipitating and attendant conditions, was the subsequent police intrusion reasonably limited in scope and intensity?

Basically, appellant contends that his constitutional and statutory rights were grievously violated in that the original intrusion was totally devoid of legal justification and that hence the subsequently seized evidence should be suppressed. Appellant's suppression motion was denied by the trial court and, as indicated, it is solely to that denial that this dissent is addressed.

There is, thus, presented another typically vibrant street encounter between police and citizen, at once potent and powerful and bringing into sharp focus the most subtle and sophisticated facets of our constitutional guarantees. The issue becomes particularly acute because there is involved not only a stop but a seizure. The nub of the problem is pithily put in *People v Cantor* (36 NY2d 106, 112), where the court said: "While the police should be accorded great latitude in dealing with those situations with which they are confronted it should not be at the expense of our most cherished and fundamental rights. To tolerate an abuse of the power to seize or arrest would be to abandon the law-abiding citizen to the police officer's whim or caprice—and this we must not do. Whenever a street encounter amounts to a seizure it must pass constitutional muster."

The reverse side of the coin, of course, is the overriding need of a free people to protect their cherished right to be safe and secure and protected in their persons and property. It is to the police that we have, in the first instance, placed the responsibility of maintaining a reasonable civil order and, concomitant with that awesome responsibility, we give to the police the right, in a proper situation, not only to arrest but to make immediate and summary street inquiry *in order to prevent crime (People v Rivera,* 14 NY2d 441, cert den 379 US 978).

When, then, does the right of the citizen "to be left alone" end and at what point does the right of the police to forcibly stop and inquire, begin?

Both statute and common law have long sustained the right

of the police, *under suspicious circumstances,* to stop and inquire, but caution is the word. It is by now quite clear, for example, that the stopping of an automobile by the police absent reasonable suspicion that its occupants have been, are then, or are about to be, engaged in conduct in violation of law, constitutes an impermissible seizure *(People v Sobotker,* 43 NY2d 559).

What then is "reasonable suspicion"? We return to *Cantor* where it says the following (pp 112-113): "Reasonable suspicion is the quantum of knowledge sufficient to induce an ordinarily prudent and cautious man under the circumstances to believe criminal activity is at hand. (Compare Schwartz, Stop and Frisk: A Case Study in Judicial Control of the Police, 58 J. Crim. L. C. & P. S. 433, 445 with La Fave, 'Street Enounters' and the Constitution: Terry, Sibron, Peters, and Beyond, 67 Mich. L. Rev. 40, 70.) To justify such an intrusion, the police officer must indicate specific and articulable facts which, along with any logical deductions, reasonably prompted that intrusion. Vague or unparticularized hunches will not suffice *(Terry v. Ohio,* 392 U. S. 1, *supra; Wong Sun v. United States,* 371 U. S. 471, 479). Nor will good faith on the part of the police be enough to validate an illegal interference with an individual (e.g., *Terry v. Ohio, supra; Henry v. United States,* 361 U. S. 98, *supra; Hill v. California,* 401 U. S. 797; *Smith v. County of Nassau,* 34 N Y 2d 18)."

The gradation of permissble police authority in any police-citizen street encounter is synopsized in *People v De Bour* (40 NY2d 210), where again the primacy of the right of the citizen to be free from aggressive governmental interference is emphasized. But the caveat is expressly set forth that that right is not absolute and the standard embracing reasonable suspicion is sustained.

In *People v Sobotker* (43 NY2d 559, *supra),* the court addressed itself specifically to the stopping by the police of automobiles. Because it is upon *Sobotker* that appellant primarily relies as strong authority for suppression here, let us spend a few brief moments in making comparisons. There, in substance, two suspects in an automobile slowed down from a speed of about five miles per hour to pause for a "second or two" and were seen to turn their heads in the direction of a bar. A few moments later when stopped momentarily for a stop sign, they "glanced" at a second bar. Upon these obviously innocuous or perhaps equivocal facts, the arresting

officer "felt that a crime was about to be committed". Nevertheless, the proceeds of the subsequent stop and search were properly suppressed. The court, applying the reasonable suspicion standard of *Cantor,* said (p 564): "The record here is bare of any objective evidence of criminal activity as of the time of the stop from which flowed the chain of events culminating in the arrest. That the officers, as one of them put it, 'felt that a crime was about to be committed', sincere as this sentiment may have been, does not suffice."

Surely, no extended discussion is required to rapidly conclude that the facts in *Sobotker* are clearly distinguishable and certainly not controlling here.

Let us therefore approach the merits and address ourselves to the basic question: Does the record here set forth "specific and articulable facts, which along with any logical deductions", reasonably support this intrusion by the police? In short, did the police have proper grounds for reasonably suspecting that appellant was about to commit a crime? (See CPL 140.50, subd 1.) Here, a far cry from *Sobotker,* a team of street-wise, experienced police officers on a stakeout in a high-crime area before 3:00 A.M. observed the appellant and two others in an automobile as they continuously circled the Lollipop block for the better part of an hour; they watched as appellant and his confreres made moves (characterized by the hearing court as furtive and evasive) in and out of the bar and its adjacent alleyway. Over the police radio they were informed that the bar owner recognized two of the men as problem makers and DeMarco advised them that as appellant and Gelardo approached the door of the bar at 3:55 A.M. he, De Marco, saw them put an unknown object into their waistbands which "might be a gun." To characterize, as the majority seems to indicate, this course of conduct as equivocal flies in the face of reality and, under the attendant circumstances, in my opinion, is a futile exercise in sterile credulity.

Here would not "an ordinarily prudent and cautious man" properly surmise that evil was abroad on Main Street at that time and place and rightly conclude that "criminal activity" was indeed afoot?

Here were these acts of appellant, the "seemingly innocuous acts" of *Sobotker?* Here were the conclusions drawn by the police, the result of the "whim, caprice or idle curiosity" of *De Bour?* I think not.

It needs to be pointed out, however, and quickly conceded,

that the conduct observed by the police did not constitute a crime or even an attempt at a crime. The record discloses no overt act which went beyond the state of mere preparation and, as was properly said in *People v Bracey* (41 NY2d 296, 300), "[t]he law does not punish evil thoughts".

But, neither does the law require the *commission* of a crime as a predicate for police intrusion. CPL 140.50 (subd 1) only requires "reasonable suspicion".

From all of the foregoing I think that the initial encounter of the police in stopping the automobile was lawful in its inception and was clearly based upon specific and articulable facts.

It should be here noted that the trial court sustained the credibility of Officer De Marco as to the "plain view" discovery of the weapon under the passenger seat and found Officer Wilson's search for the magnum to be legally permissible.

It is, however, appellant's strong contention that even assuming, *arguendo,* that the police were justified in stopping the car, their subsequent actions were constitutionally impermissible. In short, appellant maintains that by approaching the car with guns drawn and ordering its occupants out, the police effectuated an illegal seizure of appellant's person without any viable justification.

Parenthetically, and although not dispositive of this facet of the appeal, it is noted that Barrett was not a witness at the suppression hearing and, hence, it was not developed until the trial that he approached appellant with gun drawn. It is well settled that evidence missing at suppression but adduced at trial cannot be used to supply a deficiency or to buttress a weakness in evaluating the validity of a suppression order *(People v Brockett,* 64 AD2d 612).

Regardless, in the interest of justice, that factor has been weighed and found wanting insofar as the suppression hearing is concerned.

In his well-reasoned brief, appellant, citing substantial authority, stoutly maintains that "even if an individual is validly stopped, he may not be frisked unless 'independent reasonable cause' exists for the officers to believe that he is armed and dangerous." This is, of course, the law and it is statutorily expressly set forth in CPL 140.50 (subd 3) which, in substance, states that a police officer in stopping a person under the circumstances set forth in subdivision 1, *"may*

*search such person for a deadly weapon"* if he *"reasonably suspects that he is in danger of physical injury"* (emphasis supplied).

*De Bour, Cantor* and a long line of cases clearly hold that the suspicions must be reasonable and must be based on articulable facts. It is appellant's contention that there is no factual basis for the finding by the trial court that appellant was "possibly armed with a deadly weapon".

What does the record show? On cross-examination, De Marco testified that appellant and Gelardo "appeared" to put something in their waistbands and he admitted that he did not see what that "something" was. Because he honestly conceded that he did not *know* what the "something" was, the following colloquy seems supportive of appellant's position:

"Q. At any rate, in any event, you didn't communicate to any Officer by radio that you had seen Humphrey or Gelardo or any of these people put a *weapon* in their pocket, in their waist, is that correct?

"A. Weapon?

"Q. Yes.

"A. No, I didn't communicate that.

"Q. In any way did you?

"A. No, sir." (Emphasis supplied.)

Predicated upon those questions and answers, appellant charges that De Marco did not radio any of this information to the arresting officers and indeed, if the record sustains these contentions, appellant is secure in his conclusion "that the arresting officers in this case *possessed absolutely no information which would create a reasonable suspicion that appellant or his companions were armed and dangerous,* or which would otherwise justify the officers' actions" (emphasis supplied). If those were the facts, the police officers' actions in approaching the car with guns drawn would indeed constitute an unauthorized intrusion, suppression would have to follow and the indictment be dismissed.

But not so fast—the record discloses the following unchallenged testimony of De Marco:

"Q. Detective, after you had seen the Defendant Humphrey and Gelardo alongside of the car and at the point where they reached in their pocket or whatever and they left that location and tried the door, did you communicate anything to your other Officers?

"A. Yes, I did.

"Q. What, if anything, did you tell them?

[Objection overruled.]

"Q. Could you tell us what was said?

"A. I recall telling them they both just got out of the vehicle moved toward the door, they took something out of their pocket, put it underneath their coat. *It might be a gun. Maybe they were going to rob the place, at least at that time these were my thoughts and I relayed that to the men."* (Emphasis supplied.)

Even a cursory reading of De Marco's testimony, on both cross and redirect, strongly suggests that rather than "equivocal and inconsistent", the witness was straightforward and honest. With commendable candor, he admitted that he did not *know* that appellant had a gun but he did advise the police unit that it *"might be a gun"* and "maybe they were going to rob the place". It is significant that the issue was pursued no further on re-cross-examination.

Contrary to appellant's contentions, it is now clear that when Sergeant Zummo and Officers Barrett, Rossi and Wilson arrived at the scene of the arrest, although they did not *know* that appellant and Gelardo had guns, from the warning radioed to them by De Marco they were fully cognizant of specifically articulable facts which, under the attendant circumstances, would warrant a *reasonable suspicion* that the police were in grave danger of physical injury (see CPL 140.50, subd 3).

In the real world—the world of saints and sinners, yes, and of cops and robbers—the antics of appellant and his confrères in those early hours of that cold Sunday morning were hardly the innocent capers of *bon vivants* out on the town, or of law-abiding citizens engaged in other and equally innocuous proclivities. To the reasonably prudent man—let alone to trained, intelligent and experienced policemen—their conduct was highly suggestive and strongly suspect that criminal activity was afoot. To conclude otherwise, in my opinion, flies in the face of plain ordinary good sense and does violence to all we have learned or should have learned from our past experience in dealing with man, his foibles and his follies!

The reference to *People v Pollaci* (68 AD2d 71) in the opinion of Presiding Justice Mollen is noted and appreciated, but the logic of his conclusion that the reversal here is not

inconsistent with *Pollaci* is baffling indeed. There, it is true, a minor traffic violation provided the proper predicate for the arrest. Absent that factor, however, can it be seriously disputed that the facts here are infinitely more comprehensive and compelling and that they much more clearly and logically spell out the "reasonable suspicion" which is all that is necessary under CPL 140.50?

I further note that *Pollaci* cites *People v Troiano* (35 NY2d 476) which, in turn, discusses, in some depth, the minimum requirements for a lawful detention, citing *People v Cantor* (36 NY2d 106, *supra*) and *People v De Bour* (40 NY2d 210, *supra*), as it discusses the permissible scope of a subsequent search. Then, in balancing the competing considerations that (1) *law-abiding* persons be not subjected to the indignities of search and (2) police officers be not needlessly and callously exposed to physical injury or death, *Troiano* sets forth some sensible and logical conclusions that cry to be sustained. Judge RABIN in a concurring opinion, joined by Judges WACHTLER and GABRIELLI, put it this way *(People v Troiano, supra,* pp 482-483): "On the other hand, if the police are imprudently forbidden to conduct at least a search for weapons, there is the real possibility that physical injury, including death, may result to a police officer. Even ignoring factors which might be diminished by proper control, such as pretext and selectivity, the countervailing forces represent very strong interests of society. However, weighing the results, if an error in balancing is to be made, I prefer it to be on the side of security to the police officer."

To all of which, I say "Amen".

Enough is enough—the order denying suppression should be upheld. I have considered ·the appellant's other contentions and find them to be without merit. The judgment of conviction should therefore be affirmed.

MANGANO, J., concurs with MOLLEN, P. J.; SUOZZI, J., concurs in the result, with an opinion; O'CONNOR, J., dissents and votes to affirm the judgment with an opinion.

Judgment of the County Court, Westchester County, rendered March 30, 1978, reversed, on the law, indictment dismissed and case remitted to the County Court, Westchester County, for the purpose of entering an order in its discretion pursuant to CPL 160.50.